BROWN *v.* CHENEY, COMMISSIONER.

5-2446                                     350 S. W. 2d 184

Opinion delivered October 2, 1961.

[Rehearing denied November 6, 1961.]

*D. D. Panich,* for appellant.

*Lyle Williams* and *Glenn F. Walther,* for appellee.

PAUL WARD, Associate Justice. Appellant Brown, a citizen and resident of this state, owns and operates a supper club in Little Rock. Appellant Farr, a citizen and resident of Texas, owns and operates the Central Music Company in Texarkana, Arkansas. Brown owns, and operates in connection with his business, one "juke box" or record playing machine into which the customers insert a coin. Farr owns several "juke boxes" and pinball machines which he leases to different persons for use in this state. In this litigation we are concerned only with "juke boxes" or music vending machines. Ark. Stats. § 84-2604 imposes a "privilege tax" of $5 on "each music vending phonograph" to be paid annually by the owner to the Commissioner of Revenues. This tax is not here challenged by appellants.

In 1959 the legislature passed Act 120 (Ark. Stats. §§ 84-2622 to 84-2632). Section 84-2622 declares the owning, operating or leasing of "coin operated amusement devices" to be a privilege, and that such owners, operators or lessors shall pay a fee for such privilege in addition to the $5 on each machine mentioned above. Section 84-2623 provides that no one can secure such a privilege license unless, among other things, he has been a resident of this state for at least one year. The section following fixes an annual license fee of $250. Section 84-2628 requires the licensee to keep certain records (available to the Commissioner) relative to a determination of sales taxes. Section 84-2632 requires a $3,000 bond by each applicant "to insure the faithful and prompt payment of all sales tax . . ." etc.

When Appellee, Commissioner of Revenues, let it be known that the tax would be imposed on appellants, they filed suit in Chancery Court for a declaratory judgment to invalidate said Act 120 on the grounds that it is unconstitutional and "in violation of constitutional rights of plaintiffs and other taxpayers similarly situated. . . ."

Appealing from an adverse decree, appellants urge a reversal on the grounds that: (a) The Act is arbitrary, discriminatory, confiscatory, and against the police powers of the state; and (b) The Act is in violation of certain provisions of the State and Federal Constitutions.

(a)   In trying to determine whether Act 120 is arbitrary and confiscatory, etc., the first interesting question presented is whether owning and operating a coin-operated music machine is a *privilege*—i. e. whether the legislature can so declare it. In their brief appellants make this statement: "It is admitted the operation of music vending machines falls within the class commonly referred to as a *privilege,* that reasonable taxes can be imposed, but not such taxes and regulations as will be oppressive, arbitrary, discriminatory or confiscatory, such as are included in Act 120." (Emphasis added.)

Despite the above admission, we think the question should be examined further.   On first impression it might appear that a "juke box" is harmless, and that its owner should be allowed to play it as a common right, but there are other things to be considered. It is common knowledge that coin operated "juke boxes" are not usually placed in the home, but are frequently used in dance halls, drinking places, and amusement spots.   Pinball machines, the operation of which is conceded to be a privilege and so declared by statute and this Court, can also be used and operated in a perfectly harmless way, but by association and abuse they often lead to unwholesome   results.   The   legislature,   in   regulating   "juke boxes" had a right to take all these things into consideration. In the case of *White, County Treasurer* v. *Adams,* 233 Ark. 241, 343 S. W. 2d 793, which upheld Act 48 of 1945 placing a tax of $100 a week on fortune tellers, we said:

"The lawmakers are entitled to believe that no human being has the power of foretelling future events and that therefore fortune telling may be a fraudulent means of preying upon the ignorant, the superstitious, and the gullible.  Consequently it has been uniformly

held that the state, in the exercise of its police power, may constitutionally prohibit fortune telling altogether.''

One of the best definitions of *police power* of which we are aware is found in *Hinebaugh* v. *James, Tax Commr.,* 119 W. Va. 162, 192 S. E. 177. It reads:

''The police power of a state is an attribute of sovereignty, co-extensive therewith, difficult of definition because it cannot be circumscribed by mere words, latent in its nature, yet, nevertheless, perennially existing as a vast reservoir of authority to be drawn on by the law-making branch of the government for the public good. Within constitutional limits, the police power may be exercised to promote the safety, health, morals, and general welfare of society.''

We are inclined to the view that in the case before us the legislature did not exceed constitutional limitations in its effort to protect the morals and general welfare of society. This view is strengthened by the presumption that said Act 120 is constitutional. See *State* v. *Hurlock,* 185 Ark. 807, 49 S. W. 2d 611, and *Miller Levee District No. 2* v. *Evers, Collector,* 200 Ark. 53, 137 S. W. 2d 915.

Having concluded that we are here dealing with a *privilege,* it must be concluded that the legislature has great latitude in regulating it. Article 16, § 5 of the State Constitution first deals with uniformity of taxation and then says: ''. . . the General Assembly shall have power from time to time to tax . . . privileges, in such manner as may be deemed proper.''

Conceding, as contended by appellants, that the legislature under the above quoted section cannot impose a tax that is arbitrary or confiscatory, we still think Act 120 must be sustained. The Act is not arbitrary because there are good reasons, mentioned in the Act, why the legislature needed the required information for the purpose of collecting sales taxes and use taxes. Nor do we find the Act to be confiscatory. Although Brown owns only one ''juke box'' on which he must pay $250 each year, he is free to own as many as he likes without

further charge. Also, the record reflects that Brown's income from the one box is in excess of $2,000 annually.

(b)   As heretofore noted, Act 120 provides that no person can secure a license unless he has resided in Arkansas for at least one year. Farr is not a resident of Arkansas. It is appellants' contention that the residence requirement violates that part of Amendment 14 of the Constitution of the United States which states: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States. . . ." We think this contention is without merit. In the first place the Amendment deals with *citizenship* while Act 120 deals only with *residency,* and the two words have entirely different meanings. Under the Act a citizen of this state would not be eligible for a license unless he had a residency of one year. The great weight of authority supports the validity of similar residence requirements where only a privilege is involved.

In the *Hinebaugh* case *supra,* the Court said: "The purpose of the quoted language of the fourteenth amendment [same as heretofore] is to protect citizenship of the United States as distinguished from citizenship of the several states." Further, in the same case, the Court said the language in the Amendment furnished an "additional guaranty against encroachment by the states on those *fundamental* rights which belong to citizenship." (Emphasis added.) In the cited case the Court upheld a residency requirement to distribute nonintoxicating beer in West Virginia. Also, in the cited case, the Court noted that: "A West Virginia *citizen* residing beyond the state is not eligible. . . . Under this regulation citizens of other states are entitled to exactly the same privileges and immunities as are *citizens* of West Virginia." (Emphasis added.) Numerous decisions point out the difference between "resident" and "citizen". See *Ullman* v. *State,* 1 Tex. Ct. App. R. 220, 28 Am. Rep. 405; *Wyman* v. *Wyman* (Nev.), 49 F. Supp. 952; *Jeffcott* v. *Donovan* (Ariz.), 135 F. 2d 213; *Philip La Tourette* v. *Fitz Hugh McMaster* (S. C.), 248 U. S. 465, 39 Sup. Ct. 160, 63 L.

Ed. 362, and *C. N. Hankins* v. *Spaulding, Com'r.,* 78 Ida. 533, 307 Pac. 2d 222.

It is significant we think that our legislature, without successful challenge, has many times favored residents over nonresidents in regulating certain privileges, such as: The manufacture and sale of wine (Ark. Stats., § 48-110); Retail beer dealers (§ 48-515); Fur dealers (§ 47-202); The taking of mussels (§ 47-601, C.), and The practice of optometry (§ 72-806).

Appellants' contention that Act 120 violates Article 2, §§ 2, 3, 18, 19 and 29 of the State Constitution has been examined and found without merit. Section 2 deals with inalienable *rights*—not with *privileges;* Section 3 refers to discrimination based on race or color; Section 18 refers to discriminations between citizens or class of citizens; Section 19 refers to monopolies, and; Section 29 deals with rights retained by the people. We are unable to see how any of the above sections are related to or are violated by Act 120.

It is our conclusion, therefore, that the decree of the trial court must be, and it is hereby affirmed.

ROBINSON and JOHNSON, JJ., dissent.

SAM ROBINSON, Associate Justice, dissenting.

As authority for the holding that the ownership of a coin operated music machine, which in fact is a very fine musical instrument costing over $1,500, is a privilege and taxable as such, the majority cite the case of *White* v. *Adams,* 233 Ark. 241, 343 S. W. 2d 793, which is a fortune telling case. Although that case deals with the general subject of privileges, it does not touch on the subject of the ownership of property as a privilege. There is hardly any comparison between the right to tell fortunes and the right to own property.

In the case at bar we are dealing with one of the most sacred constitutional rights. Article 2, § 22 of the Constitution of Arkansas provides: "The right of property is before and higher than any constitutional sanction; . . ." Appellant Brown is in the restaurant

business. Incidental to that business he has available for the enjoyment of his customers a music machine that may be played by depositing a coin in a slot. In my opinion it is not a privilege to own and use such a machine; it is a matter of common right. It is conceded by all that Brown could play the machine at his place of business to his heart's content if he would remove the coin operation feature of it and play the machine by merely pressing a button or by permitting the customers to do so. And, according to the reasoning of the majority, a customer could pay the cashier for playing the machine and no privilege would be involved. But if a nickel is put in the slot, it is a privilege. The right to listen to good music, or bad music if one prefers, has been a common right of mankind since before the dawn of recorded history. Even the least advanced of savage tribes have some form of music, but here if one uses a small coin in a certain way to enable him to listen to recorded music of his choice, a privilege is involved.

In the very early days of statehood the question of what is a privilege first came before the courts, and although since that time a number of things have been declared to be privileges, this Court has always sustained the doctrine that a matter of common right cannot be converted into a privilege by an act of the legislature. The majority say that to own, operate or lease a coin operated music machine is a privilege. But Act 120 of 1959 provides that "The business of owning, operating or leasing coin operated amusement devices . . . is hereby declared to be a privilege. . . ." The majority point out that "It is common knowledge that coin operated 'juke boxes' are not usually placed in the home." This is true enough, but it is equally a matter of common knowledge that coin operated music machines in the form of television sets are now widely used in homes and at this very time facilities for putting such machines in homes in Little Rock are being installed. In view of the decision in this case, it is now very likely that each owner of such a coin operated machine will have to pay an annual tax of $250 for the privilege of listening to music that may be provided by such machine.

I can hardly see how there can be any valid distinction between music that comes over the air and thence through a machine and music that comes from a record through a machine.

The first case to come before the Court on the question of what is a privilege was *Stevens & Woods* v. *State*, 2 Ark. 291. Article VII, § 2 under "Revenues", of the Constitution of 1836, in respect to the taxing of property and privileges, is the same as Art. 16, § 5 of the Constitution of 1874. In the *Stevens & Woods* case there was involved the constitutionality of a tax assessment of $1,000 on the keeping of two billiard tables. The issue decided by the Court was whether the keeping of a billiard table could be taxed as a privilege. The Court held that it could not be so taxed; that it was a matter of common right and could not be converted into a privilege by an act of the legislature. The case is closely in point with the case at bar, because not only is the same principle involved, but the Court actually compared the keeping of a billiard table with the keeping of musical instruments. We take the liberty of quoting rather extensively from the *Stevens & Woods* case. The Court said: "The meaning of the word 'privilege' is to be looked for in the common law. In the realm of England, and by the English law, there were a multitude of privileges of various kinds, most of which never crossed the Atlantic or took root in our soil. . . . In this country few, if any, privileges exist by prescription, and few of those known in England exist by Legislative grant. But it is a certain class of privileges created in all the States by grant from the Legislature, such as banking, the privilege of keeping ferries, and holding and keeping toll-bridges, of making and receiving toll on turnpikes, canals, and railroads; and unquestionably other privileges of the same nature might be created, and when created, would be taxable. These are all special rights, powers, and privileges, not existing before, but created *pro hac vice,* and granted out by the Legislature as exclusive rights and franchises. Such privileges which are sources of wealth, or rather wealth in themselves, created and conferred by Legislative grant,

and not capable of valuation like tangible and corporeal property, are property taxable as privileges.

"But the Legislature cannot, by first prohibiting the use of any article or the exercise of any calling, and then allowing it upon payment of a certain sum into the Treasury, create a privilege. If this could be done, there would no longer be any meaning or effect in the provision that no one species of property should be taxed higher than another species of property of equal value. If this could be done, the Legislature could tax every bureau a hundred dollars, or every table, or chair, or sofa, or book-case, to the same amount, merely by prohibiting the use or possession of each article except upon payment of such sum, and so making it a privilege to have, use, or possess it. They might pass sumptuary laws, and tax shoes, boots, hats, coats, cloaks, and every article of dress, comfort, luxury or necessity, by pursuing the same course, and making it a privilege to have, wear, or possess it.

"There are certain rights which belong to us as free men; we do not derive all our rights from Legislative grant; we have some which belong to us by nature, and as citizens of a free country; such are the rights of holding any species of property we choose, of wearing whatever garments we choose, and of possessing and holding any article of comfort or luxury which we please. As all [of] them belong to us originally, they cannot be converted into privileges by any process of Legislative alchemy. No such magical transmutation can be effected. If it could, nothing would be easier than by the enactment of sumptuary laws and acts creating privileges to transform us at one sweep from free citizens of a republic to the mere serfs of the soil.

"The right to keep and use a billiard table is one of these common rights. It is an article of furniture which every citizen had the right to own and possess before we framed the Constitution, and the Legislature cannot confer upon us the *privilege* of keeping what we already *ex communi jure* have the right to keep and use. Privileges are not so created; if they are, every thing

can be transmuted into a privilege, and by undergoing this process, an article of property worth a hundred dollars may today be taxed one dollar and tomorrow a thousand, while another article of the same, may still remain subject to the original tax of one dollar. Why not in the same tax the privilege of raising cotton, or hemp, or wheat, and so make a tax payable by one portion of the State alone.

"The playing of billiards has not been yet made a criminal or penal offense, and therefore every person has the right either to keep or play on such a table. He has the same right to do so that he has to *keep or play on a flute, violin, or organ;* and if one can be made a privilege while it is lawful for every man, so may the other. There is nothing unlawful or criminal in one more than in the other, by the law of nature, or the code of morality, neither *malum prohibitum* or *malum per se.* To keep a billiard table therefore stands upon the same ground with keeping any other article of furniture, or for the purpose of amusement, and one cannot be changed into a privilege any more than the other.

"A privilege, therefore, is a new right created by Legislative grant; not a right existing before and common to all, but now prohibited unless on payment of a sum into the exchequer. It is a portion of the prerogative of the State, carved out and given to an individual or a corporation. This is no such privilege. Nor could a privilege be created by declaring the keeping of a billiard table criminal, and then allowing it on payment of a sum in gross; that would be pandering to crime and present the strange spectacle of Legislative creation of a privilege to commit crime. It might be forbidden altogether, but it could never be made a privilege.

"The keeping of a billiard table, therefore, is no privilege, and therefore cannot be taxed as such, and if so, it follows, as an inevitable consequence, that the law in question is unconstitutional. That it is so we have not the slightest doubt." (Emphasis supplied.)

In the same volume of the Arkansas Reports, there is the case of *Gibson* v. *Pulaski County,* 2 Ark. 309. It

was there held that the keeping of a stallion was a matter of common right and that it could not be taxed as a privilege. In *Washington* v. *State,* 13 Ark. 752, a distinction between a state tax and a county or municipal tax was pointed out; decisions in the *Stevens & Woods* case and the *Gibson* case were left intact. About ninety years later Judge Frank Smith wrote the original opinion involving the validity of the state income tax in the case of *Sims* v. *Ahrens,* 167 Ark. 557, 271 S. W. 720 (1925). There Judge Smith cited the cases of *Stevens & Woods* v. *State* and *Gibson* v. *Pulaski County,* above mentioned, along with *McGehee* v. *Mathis,* 21 Ark. 40; *Straub* v. *Gordon,* 27 Ark. 625; *Little Rock* v. *Barton,* 33 Ark. 436; *Little Rock* v. *Board,* 42 Ark. 160; *Baker* v. *State,* 44 Ark. 134; and *State* v. *Washmood,* 58 Ark. 609, 26 S. W. 11, and said: "Under the doctrine of stare decisis, these cases have become the settled law of this State, and, until they are overruled, which up to this hour has not been done, this court cannot consistently hold that it is within the power of the Legislature to declare and tax as privileges, for State revenue, pursuits and occupations which are matters of common right. To so hold would be to overrule all these cases, and, if they are to be overruled at all, it should be done expressly, and not by implication."

A rehearing was granted and Judge Wood wrote the majority opinion holding that the state income tax is neither a property tax nor a privilege tax, but is an excise tax and not prohibited by Art. 16, § 5 of the Constitution. The Court referred to the case of *Stevens & Woods* v. *State,* 2 Ark. 291, and other cases of a similar nature, on down to *Standard Oil Co.* v. *Brodie,* 153 Ark. 114, 239 S. W. 753, and said: "Those cases have not been overruled, and therefore the above provisions of our Constitution should be interpreted to read as follows: 'The General Assembly shall have power from time to time to tax hawkers, peddlers, ferries, exhibitions and privileges in such manner as may be deemed proper, but it shall not tax for purposes of State revenue pursuits and occupations that are matters of common right.' "

In *Thompson* v. *Wiseman,* 189 Ark. 852, 75 S. W. 2d 393, appellant owned and operated certain coin operated devices. Act 137 of the General Assembly for the year 1933 provides for assessing a tax on vending machines, including music vending machines. The Court upheld the tax, but treated the case as applying to those who operated the machines. The 1933 Act provides: "It shall be unlawful for any person, firm or corporation, or agents or receiver thereof, to operate or permit the operation of any of the machines mentioned in Section 1 of this Act. . . ." Now the majority are holding that mere ownership of such machines is prohibited without first having paid the $250 tax.

In my opinion the Act under consideration, Act 120 of 1959, does not provide for a tax for the mere ownership or operation of a single music machine, but does tax the *business* of owning, operating or leasing coin operated music devices. There is nothing in the record in this case to indicate that appellant Brown is in the business of owning and operating or leasing music machines. He is in the restaurant business. The fact that he incidentally uses a stove certainly does not mean that he is in the stove business, nor does the fact that he may incidentally use a pick-up truck mean that he is in the business of owning, operating or leasing trucks. On the other hand, appellant Lynn Farr, doing business as the Central Music Company, is in the business of owning, operating and leasing the machines. The $250 tax assessed against him is valid under the decision in *Thompson* v. *Wiseman.*

I might add that the effect of Act 120 of 1959 is to give certain residents of Arkansas engaged in the business of owning all kinds of slot operated devices, including coin operated music machines, a monopoly in that field, and this is against public policy. No doubt a goodly portion of the operators own dozens and perhaps hundreds of such slot operated devices and it would be no burden on them to pay an annual tax of $250. But in many instances the little man having but one machine in his restaurant cannot afford to pay the $250 in addi-

tion to the sales tax paid at the time of the purchase of the machine, the regular annual ad valorem taxes, the sales tax on the money taken in by the machine, the federal income tax and the state income tax on the money received. Hence, he will have to use a machine belonging to a big operator, and pay as rent at least one-half, or perhaps more, of the money taken in by the machine. According to the record, there are in the State only 117 owners of coin operated devices alleged to come under the Act. This includes people such as Brown who own only one machine. The 117 owners own 6,790 machines in the State; hence, the operators own an average of 58 machines each. When it is considered that many owners have only one, a very few must own a large number, many more than the average of 58.

For the reasons set out herein, I respectfully dissent from that part of the opinion which holds that Brown is liable for the tax.

JOHNSON, J., joins in this dissent.